UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x
ALBERTO AMBROSE,                                    11 - CV - 2026  (KAM) (CLP)

      Plaintiff,

 -against-                                    **PROPOSED SECOND
              AMENDED COMPLAINT AND
              JURY DEMAND**

THE MOUNT SINAI HOSPITAL and
MAXINE SHEPHERD,

      Defendants.
-----------------------------------------------------x

## PRELIMINARY STATEMENT

1. Plaintiff brings this action for race, color, ethnicity and national origin discrimination, harassment and retaliation with respect to terms and conditions of employment pursuant to 42 U.S.C. § 1981 ("Section 1981"); Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq.;* to the New York State Human Rights Law, Executive Law Section 296, *et seq.* ("SHRL"); and New York City Human Rights Law, §8-107 *et seq.* of the Administrative Code ("CHRL").

2. Plaintiff brings this action for violations of the Family Medical Leave Act, 29 U.S.C.S. § 2601 *et seq.* ("FMLA").

## JURISDICTION

3. Jurisdiction is conferred upon the Court by 28 U.S.C. §§ 1331, 1343 and 1367(a).

4. Venue is proper within the Eastern District of New York because at least some of the events giving rise to this action occurred within this district and/or because Plaintiff resides in this district and/or because THE MOUNT SINAI HOSPITAL has some premises in Kings County.

5. Furthermore, Defendants have waived any objections to venue.

6. All conditions precedent to the institution of this suit have been satisfied.

## PARTIES

7. Plaintiff Alberto Ambrose ("Mr. Ambrose" or "Plaintiff") is a Hispanic male from Cuba who resides in this State and District.

8. At all relevant times herein, Mr. Ambrose was an employee of Defendants.

9. THE MOUNT SINAI HOSPITAL ("MOUNT SINAI" or the "Hospital") is a private corporation in the business of providing medical treatment with locations in New York City.

10. Defendant MAXINE SHEPHERD ("Defendant Shepherd") was, at all relevant times, a manager and supervisor who directed and supervised Plaintiff's work and had supervisory authority over Plaintiff and had the power to discipline him.

## STATEMENT OF FACTS

11. On July 24, 2006, Defendants hired Plaintiff as a Patient Care Associate ("PCA") ostensibly on a part time basis.

12. During the last two years of his employment at the Hospital, Plaintiff also became a certified medical interpreter and voluntarily provided interpretation services to the Hospital's Spanish-speaking patients.

13. Plaintiff was hired to work in the Hospital's Medical Intensive Care Unit 5-West ("Unit 5-West").

14. Plaintiff's direct supervisor was Defendant Shepherd, the Hospital's Manager/Supervisor for Unit 5-West.

15. Defendant Shepherd is a Black woman from Jamaica.

16. Despite being hired for a part time position, Plaintiff actually worked at least 37.5 hours per week five days a week.

17. This is partly because for a large part of his tenure, Plaintiff was the only PCA on duty during his 7AM-3.30PM shift.

18. Upon information and belief, the Hospital was supposed to staff each shift at the unit with two PCAs.

19. Thus, when Plaintiff was the sole PCA on his shift, he was required to perform the work of two PCAs and take care of approximately 14 critical care patients at any one time and assist approximately eight registered nurses.

20. Plaintiff's work performance was good throughout his tenure in the Hospital.

21. Mr. Ambrose's good work performance was reflected in his performance appraisals, until he started to complain of Defendant Shepherd's discrimination and harassment, whereupon Plaintiff's annual performance evaluations became unjustifiably negative and critical of his performance.

22. Defendants Shepherd was responsible for preparing Mr. Ambrose's performance evaluations.

## Defendants Refused to Adjust Plaintiff's Status to Full Time.

23. Despite working full time hours, Plaintiff's part time status was maintained throughout his employment.

24. As a part time employee, Plaintiff lacked the benefits of a full time employee.

25. Upon information and belief, within six months of being hired, Plaintiff should have been considered for a full time position.

26. Therefore, in or about February, 2007, Plaintiff told Defendant Shepherd that he wanted to become a full time employee.

27. Mr. Ambrose told Defendant Shepherd that he was eligible under the collective bargaining agreement ("CBA") to become full time after six months of employment.

28. Defendant Shepherd told Plaintiff that she would "look into it."

29. Yet at no point did Defendant Shepherd satisfactorily address the issue of Plaintiff's part time status and she refused to provide adequate explanations for why Plaintiff never became a full time employee.

30. Instead, Defendant Shepherd would deflect the issue entirely by claiming that the Hospital's Department of Labor Relations was "looking into" Plaintiff's part time status.

31. Throughout Plaintiff's employment he remained a part time employee but continued to work a full time schedule and thus was deprived of important benefits and advancement opportunities.

32. For example, after a year of employment, Plaintiff was paid a mere two days vacation whereas he should have accrued two weeks paid vacation leave.

33. After two years at the Hospital, Plaintiff received a mere four days of paid vacation.

**Evidence of Discrimination: Defendants Hire Four Jamaican PCA's After Plaintiff and Within A Few Months They Become Full Time Employees**.

34. In or about 2008, Defendants hired four new PCA's to work in Plaintiff's unit.

35. Upon information, within four or six months of hiring these PCAs, all four were made full time employees.

36. These four PCAs were all from Defendant Shepherd's home country, Jamaica, and upon information and belief, Defendant Shepherd procured their employment.

4

37. Given the failure to change his status to full time, and the obvious favoritism shown to the other four recently hired Jamaican PCAs, on November 30, 2008, Plaintiff met with Tanya Isaacs in the Hospital's Department of Labor Relations.

38. During this meeting, Plaintiff told Ms. Isaacs that it was unfair that he was not still occupying a part time position after well over two years of employment with the Hospital yet he was working a full time schedule.

39. Mr. Ambrose then referred to the fact that four other Jamaican PCAs hired in 2008 were given full time positions within a few months of being hired which was "unfair."

40. Plaintiff told Ms. Isaacs that he believed Defendant Shepherd had favored the other PCAs because they were all from her country.

41. Ms. Isaacs responded that she would look into the issue and immediately called Defendant Shepherd to find out why Plaintiff was still a part time employee after two years and four months of employment at the Hospital.

42. Upon information and belief, Defendant Shepherd failed to provide an adequate explanation.

43. Given Ms. Isaacs' actions, Defendant Shepherd's oft-stated claim since January 2007 that the Department of Labor Relations had been "looking into" changing Plaintiff's status was revealed to be a lie.

### **Defendant Shepherd Retaliates Against Plaintiff.**

44. Soon after Plaintiff's meeting with Ms. Isaacs, Defendant Shepherd approached Mr. Ambrose and stated aggressively, "I don't appreciate you going over my head."

45. After this time, Defendant Shepherd engaged in a campaign of harassment in order to undermine Plaintiff and procure his unlawful discharge.

46. For example, Plaintiff's annual work evaluation for 2008, completed by Defendant Shepherd, was very negative and did not accurately reflect Plaintiff's work performance.

47. Plaintiff's prior work appraisals for 2006 and 2007 had been generally positive.

48. Moreover, in 2008, Plaintiff's pay was docked by one week without reason.

49. Defendant Shepherd falsely claimed that Plaintiff's pay was docked due to a "mistake."

50. Defendant Shepherd attempted to undermine and intimidate Mr. Ambrose at every opportunity and regularly threatened to fire him without justification.

51. For example, on September 11, 2009, Defendant Shepherd approached Plaintiff and stated that he was "walking on a thin line."

52. On November 9, 2009, Defendant Shepherd threatened to fire Plaintiff.

53. On November 23, 2009, Defendant Shepherd again told Mr. Ambrose that he was "about to lose" his job.

54. On December 4, 2009, Plaintiff obtained authorization for a one day's sick leave yet Defendant Shepherd refused to pay him for this sick day insisting that Mr. Ambrose bring in a doctor's note.

55. Defendant Shepherd did this despite knowing that Plaintiff had remained at home during his sick day and had not consulted a doctor.

56. At this time, Plaintiff had accrued sick leave time and was entitled to take a day off.

57. Plaintiff had rarely taken any sick days during his employment.

58. On December 9, 2009, Defendant Shepherd threatened to write Plaintiff up for a completely unjustified reason.

59. In or about January, 2010, Defendant Shepherd provided Plaintiff with hi9s written work appraisal for 2009.

60. This was a very biased evaluation that unfairly rated Plaintiff poorly in numerous aspects.

61. Other acts of disparate treatment by Defendant Shepherd include the fact that she did not allow Plaintiff to speak in his native Spanish with co-workers, patients or even to his family members.

62. Yet, many of the personnel and patients in the Hospital were Hispanic whose first language was Spanish.

63. Moreover, as stated above, Plaintiff had become a Certified Medical Interpreter during the last two years of his employment and he voluntarily provided interpretative services without pay.

64. Despite providing this very valuable service, Defendant Shepherd was undeterred and she continued to impede Plaintiff's use of Spanish within the Unit.

65. Defendant Shepherd allowed others to speak in their native language while at work without repercussion and in fact various languages were routinely spoken within the Unit, such as Filipino and Hindi.

### Plaintiff Complains of the Harassment and Disparate Treatment and Lodges Union Grievances

66. After Defendant Shepherd started to harass Plaintiff, Mr. Ambrose complained numerous times to Defendant Shepherd herself but to no avail.

7

67. Throughout Plaintiff's employment, he also opposed the disparate treatment and Defendant Shepherd's harassment by lodging several complaints with management and grievances with his union.

68. Plaintiff's union delegate was Gary Moore who was privy to much of Plaintiff's protected activity.

69. Rather than remedy Plaintiff's hostile work environment, Plaintiff's complaints merely triggered further reprisals, more harassment and intense scrutiny.

70. Mr. Moore confided in Plaintiff that during a meeting that he had with the Director of Labor Relations and Defendant Shepherd, the Director of Labor Relations told Defendant Shepherd that if she wanted to fire Plaintiff "all she had to do" was to issue him with written disciplinary warnings or written reprimands.

71. Upon information and belief, Defendant Shepherd was required to issue five written warnings to procure Plaintiff's discharge.

72. On December 11, 2009, Plaintiff requested an immediate transfer from 5-West Unit due to the "constant" harassment he was suffering at the hands of Defendant Shepherd.

73. Mr. Ambrose cited as an example the fact that his pay was docked for being out sick for one day.

74. Docking Plaintiff's wages as a result of a serious medical condition is a violation of the FMLA.

75. During this time, Plaintiff also requested a meeting with the Hospital's Vice President, Carol Porter, to complain about Defendant Shepherd's discrimination and harassment.

76. Without adequate explanation, Ms. Porter failed to meet with Mr. Ambrose.

77. Meanwhile, Defendant Shepherd continued to harass Mr. Ambrose with impunity.

78. Defendant Shepherd instructed other supervisors within the unit to scrutinize Mr. Ambrose's every move, and for example, to record the time Mr. Ambrose took for lunch breaks or to use the bathroom.

79. Defendant Shepherd encouraged others under her supervision to reprimand Plaintiff.

80. Defendant Shepherd did so in order to procure Mr. Ambrose's termination.

81. For example, Hamid Sayyed, who worked in the Unit also, would monitor when Mr. Ambrose went to the bathroom or when he took brief breaks for lunch and would unfairly berate him.

82. Defendant Shepherd would typically force Mr. Ambrose to miss his lunch break or take an abbreviated lunch break of a mere 5 to 15 minutes despite the fact that he was entitled to an hour for lunch.

83. On February 6, 2010, Defendant Shepherd falsely accused Plaintiff of a work performance issue.

84. On February 10, 2010, Defendant Shepherd issued Plaintiff with an unjust and negative annual performance evaluation for 2009 that unfairly criticized his work performance.

85. While providing Mr. Ambrose with a copy of the performance appraisal for him to read, Defendant Shepherd stated to Plaintiff, while laughing, "It is so easy to fire you!"

86. After Plaintiff read his appraisal, Defendant Shepherd took it from him and refused to provide him with a copy.

87. Plaintiff left Defendant Shepherd's office in utter disbelief as to what had just transpired.

**Plaintiff's Health Deteriorates & Prompts Plaintiff to Take FMLA Leave**

88. As a result of the intense scrutiny, unjust criticism and harassment by Defendant Shepherd and others, Plaintiff's health and mental well being began to deteriorate severely.

89. Plaintiff hypertension was exacerbated to dangerous levels and he began to suffer stress and anxiety.

90. On March 1, 2010, Plaintiff was evaluated by a nurse within the unit, Ruby Lopez, and found that his blood pressure was very high.

91. Ms. Lopez advised Plaintiff to take a break from work and take his blood pressure medication.

92. Plaintiff took a brief break.

93. Because he took a brief rest, the next day Defendant Shepherd issued Plaintiff his first written warning for being absent from work.

94. In March 2010, and citing the ongoing harassment, Plaintiff requested again that he be transferred to another unit.

95. At this time, Plaintiff also requested a transfer by writing to Susan Davis, the Hospital's Nursing Director.

96. Without explanation, Plaintiff's urgent requests to be transferred fell on deaf ears and he remained in Unit 5-West.

97. On April 9, 2010, Defendant Shepherd again falsely accused Plaintiff of leaving the Unit briefly without permission.

98. On May 20, 2010, Defendant Shepherd issued Plaintiff with his second unfair written warning.

99. On May 27, 2010, Plaintiff requested and was approved for 11 days of FMLA leave due to his deteriorating health, including high blood pressure and stress and anxiety brought on by Defendants' retaliation and harassment.

100. When Plaintiff returned to work, Defendant Shepherd's harassment continued unabated.

101. Moreover, Defendant Shepherd issued Plaintiff with disciplinary notices as a result of his medical leaves of absence in violation of the FMLA.

102. On July 22, 2010, Plaintiff was issued with his third false write up.

103. In September, 2010, Plaintiff's "PCA Log Book" went missing from his locker.

104. Plaintiff had been keeping contemporaneous daily notes of the harassment by Defendant Shepherd in this log book over the past two years.

105. Plaintiff never recovered this log book.

106. On October 28, 2010, Plaintiff was issued with his fourth unfair written warning.

107. On September 24, 2010, Plaintiff took a brief 15 minute morning break to take his blood pressure medication and have his breakfast.

108. Plaintiff took his break along with the nurses in his unit.

109. Plaintiff was written up and docked one hour of pay for taking this brief break yet none of the nurses were written up.

110. On September 26, 2010, this incident prompted Plaintiff to file a grievance in which he complained that he was being "discriminated and harassed …almost every day" to "have me lose my job."

111. On December 17, 2010, Defendant Shepherd again unjustly wrote Plaintiff up ostensibly for an issue involving the ID band of a patient.

112. On December 23, 2010, Plaintiff's employment was unlawfully terminated.

### **Plaintiff Grieves His Discharge**

113. On January 8, 2011, Plaintiff filed a grievance and a written complaint in which he cited some of the instances of "discrimination," such as "wrongful evaluations" and unfair and biased "warnings."

114. Plaintiff wrote that "[i]f all this is not "DISCRIMINATION", then I don't know how to call it."

115. In his January 8, 2011 complaint, Plaintiff also cited Defendant Shepherd's practice of preventing him on "various occasions" from assisting nurses with immediate urgent patient care and instead assigning him other duties.

116. Plaintiff also cited times when Defendant Shepherd prevented him from using face masks and gowns when dealing with bodily fluids and excretions in breach of medical standards of care.

117. Predictably, hearings held to air Mr. Ambrose's grievances were always decided against Plaintiff given that the persons convening the hearings and rendering the determinations were all Hospital managerial employees, usually members of Defendants' Labor Relations Department.

118. Moreover, Defendants would sometimes successfully prevent testimony supportive of Plaintiff from being presented at the hearings.

119. For example, on more than one occasion, the Hospital failed to advise Plaintiff, his union delegate and Mr. Ambrose's witnesses about the date and time of an upcoming hearing until two hours prior to the hearing itself.

120. As such, some witnesses who were going to provide testimony on Mr. Ambrose's behalf were prevented from doing so due to the late notice.

121. The union failed to present Plaintiff's claims before an arbitrator and thus Mr. Ambrose's claims for employment discrimination and retaliation have never been arbitrated.

## Conclusion

122. Defendants discriminated Plaintiff throughout his employment and created a hostile work environment based on his race and in retaliation for his complaints.

123. Defendants discriminated against Plaintiff by refusing to provide Plaintiff with a full time position in favor of more junior PCAs from Jamaica who were all given full time positions soon into their employment.

124. Defendant Shepherd downgraded Plaintiff's performance appraisals, berated and undermined Mr. Ambrose and wrote him up for false reasons with the sole aim of procuring Plaintiff's unlawful termination.

125. The actions stated herein were discriminatory in that they were motivated because of Plaintiff's race, color and/or ethnicity and in retaliation for Plaintiff's opposition to the discrimination.

126. The actions complained of herein were committed intentionally by Defendants and constitute a continuing policy and practice of discrimination.

127. Defendants also violated the FMLA by disciplining Plaintiff, including issuing

him with write ups and terminating his employment, due to Plaintiff's medical leaves of absence and various intermittent leaves taken due to his serious medical condition, namely hypertension.

128. At all relevant times, Defendants knew their obligations under the FMLA but wilfully violated those obligations.

129. The various violations of law which are alleged herein were committed intentionally and/or willfully by Defendants.

130. Defendants aided, condoned and abetted Defendant Shepherd's discrimination and retaliation against Plaintiff and allowed it to persist unabated throughout his employment.

131. Defendants' actions have caused Plaintiff great emotional distress, humiliation and financial hardship.

## FIRST CAUSE OF ACTION: SECTION 1981

132. The allegations in the preceding paragraphs are repeated here as if fully stated.

133. Defendants intentionally retaliated against and discriminated against Plaintiff on the basis of his race and color in violation of Section 1981.

134. Defendant Shepherd was personally involved in the discrimination and retaliation through her direct participation.

135. Plaintiff has thereby been damaged in an amount as yet undetermined, but exceeding $500,000.

## SECOND CAUSE OF ACTION: TITLE VII

136. The allegations of the preceding paragraphs are repeated here as if fully stated.

137. Defendants intentionally discriminated against Plaintiff on the basis of his race

and ethnicity and subjected him to a racially hostile work environment.

138. Defendants also retaliated against Plaintiff for his protected activity.

139. Plaintiff has thereby been damaged in an amount as yet undetermined, but exceeding $500,000.

### THIRD CAUSE OF ACTION: SHRL

140. The allegations in the foregoing paragraphs are repeated here as if fully stated.

141. By their actions stated herein above, Defendants and their agents discriminated, harassed, created a hostile work environment and retaliated against Plaintiff with respect to his race, ethnicity and color in violation of the SHRL.

142. Plaintiff has therefore been damaged in an amount as yet undetermined but exceeding $500,000.

### FOURTH CAUSE OF ACTION: CHLR

143. The allegations in the foregoing paragraphs are repeated here as if fully stated.

144. By their actions stated herein above, Defendants and their agents discriminated, harassed, created a hostile work environment and retaliated against Plaintiff with respect to his race, ethnicity and color in violation of the CHLR.

145. Defendant Shepherd personally directed the discriminatory, harassing and retaliatory conduct and/or aided in and abetted that conduct.

146. Plaintiff has therefore been damaged in an amount as yet undetermined but exceeding $500,000.

## FIFTH CAUSE OF ACTION: FMLA

147. The allegations of the preceding paragraphs are repeated here as if fully stated.

148. In disciplining Plaintiff and terminating his employment for having taken FMLA medical leave and intermittent leaves for a serious medical condition, Defendants intentionally violated the FMLA by interfering with, restraining and/or denying Plaintiff's attempts to exercise his rights under the FMLA.

149. Plaintiff has thereby been damaged in an amount as yet undetermined, but exceeding $500,000.

WHEREFORE, Plaintiff demands that judgment be granted as follows:

A. The amount sought for each cause of action;

B. Liquidated damages;

C. Compensatory damages for lost pay and emotional distress.

D. Punitive damages;

E. Attorneys fees and costs; and

F. Other remedies that the court deems just and appropriate.

Dated: New York, New York
November 14, 2013

**LAW OFFICES OF IAN WALLACE, PLLC**

By: _____/s/_____

Ian F. Wallace (IW: 3100)
*Attorney for Plaintiff*
501 Fifth Avenue – 19th Floor
New York, N.Y. 10017
(212) 661-5306